IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **DANIEL HEILMAN,** | CASE NO. 3:22 CV 2132 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **PANDROL, INC.,** | |
| | MEMORANDUM OPINION AND |
| Defendant. | ORDER |

## INTRODUCTION

Currently pending before the Court in this age discrimination in employment action is Defendant Pandrol, Inc.'s Motion for Summary Judgment (Doc. 2). Plaintiff Daniel Heilman opposes (Doc. 23), and Defendant replies (Doc. 24). Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367.

For the reasons discussed below, Defendant's motion for summary judgment is granted.

## BACKGROUND

Plaintiff has worked for Defendant since 1997. (Plaintiff Depo., at 12-13).[1]

Plaintiff received an Employee Handbook dated July 2016, which contained an anti-bullying policy, which defined bullying in part as "unwelcome or unreasonable behavior that demeans, intimidates or humiliates people." (Plaintiff Depo., at 110-12, 114); (Ex. 13, Plaintiff Depo., Doc. 22-2, at 78). An updated Employee Handbook was issued in December 2018, containing the same anti-bullying policy (Ex. 14, Plaintiff Depo., Doc. 22-2, at 134-35); Plaintiff

---

1. Excerpts of Plaintiff's Deposition are located at ECF Doc. 22-1. The references herein refer to the deposition page number rather than the ECF page number.

participated in a training in July 2020 at which he received this updated Employee Handbook (Plaintiff Depo., at 116-17).

Defendant's "Pandrol USA Plant Employee Disciplinary Guidelines" included a guideline regarding "Personal Conduct" and identifying a violation for "comments or behavior, whether verbal or written to or about co-workers, management or others that can be interpreted or viewed as abusive or intimidating." (Ex. 15, Plaintiff Depo., Doc. 22-2, at 168). Plaintiff testified he received this and received training regarding it. (Plaintiff Depo., at 117-18); (Ex. 17, Plaintiff Depo., Doc. 22-2, at 180). These guidelines provided, and Plaintiff was aware, that a fourth offense of this particular guideline would result in termination. (Ex. 15, Plaintiff Depo., Doc. 22-2, at 168); (Plaintiff Depo., at 121). Plaintiff acknowledged these guidelines were in place throughout his employment. (Plaintiff Depo., at 121-22).

Plaintiff was disciplined (in verbal and written form) numerous times while employed with Defendant. (Plaintiff Depo., at 123).

In November 2015, Plaintiff received a Corrective Action Report from Defendant. (Plaintiff Depo., at 124); (Ex. 16, Plaintiff Depo., Doc. 22-2, at 173). This document indicates it is a "Final Written Warning" because Plaintiff "physically shoved another employee". (Ex. 16, Plaintiff Depo., Doc. 22-2, at 173). Plaintiff testified that prior to this report, he had received a warning regarding a verbal altercation with another employee. (Plaintiff Depo., at 124) (When asked whether he had received a written warning prior to this one, Plaintiff responded: "I think there was another incident with somebody . . . I pushed, I think I pushed Tyler Corden."). The document indicated – and Plaintiff understood – that "failure to improve . . . performance/behavior or additional incidence/s of any unsatisfactory performance or behavior

may result in further corrective action up to and including recommendation for termination." (Ex. 16, Plaintiff Depo., Doc. 22-2, at 173); (Plaintiff Depo., at 128-29).

In February 2017, Plaintiff received a written "Disciplinary Notice" for "bullying and threatening co-workers." (Ex. 18, Plaintiff Depo., Doc. 22-2, at 259); (Plaintiff Depo., at 133-34); (Ex. 17, Plaintiff Depo., Doc. 22-2, at 182). The reason for the notice reads: "Multiple employees have filed complaints, and management has witnessed harassment of employees. There have been reports of threats of bodily injury, aggressive gestures, and name calling on a regular basis." (Ex. 18, Plaintiff Depo., Doc. 22-2, at 259); (Plaintiff Depo., at 134). This notice stated: "Correction required is to refrain from bullying or harassing other employees immediately. If this behavior continues, further disciplinary actions will be taken according to the progressive discipline policy in the employee handbook which may include[:] writeups, suspensions, or termination." (Ex. 18, Plaintiff Depo., Doc. 22-2, at 259). Plaintiff was aware of this. (Plaintiff Depo., at 137).

In December 2017, Plaintiff received a written "Disciplinary Notice" for "pushing another employee." (Ex. 21, Plaintiff Depo., Doc. 22-2, at 276); (Plaintiff Depo., at 138-39). This was the second time Plaintiff had pushed a fellow employee. *Id.* at 143-44. As a result of the December 2017 incident, Plaintiff was sent home and suspended for one day. (Ex. 21, Plaintiff Depo., Doc. 22-2, at 276). The notice stated: "There is to be no further violence toward an[other] employee. This behavior change is required immediately, if the behavior continues further disciplinary action up to termination can occur." *Id.* Although it is not entirely clear which incident occurred on which date, Plaintiff recalled two incidents in which he pushed fellow employees. (Plaintiff Depo., at 139, 143-44).

3

In February 2018, a Disciplinary Notice indicates Plaintiff "was pulled into a conversation that he responded in a threatening manner". (Ex. 24, Plaintiff Depo., Doc. 22-2, at 277); (Plaintiff Depo., at 150-51). The notice states: "Verbal warning – further incidents will result in time off (unpaid) 3 days min. and further write-up including termination." (Ex. 24, Plaintiff Depo., Doc. 22-2, at 277); (Plaintiff Depo., at 150-51).

In February 2019, Defendant issued Plaintiff a "Performance Correction Notice" which was also a "Final Written Warning". (Ex. 25, Plaintiff Depo., Doc. 22-2, at 278-79); (Plaintiff Depo., at 152-53). Plaintiff was issued a one-day unpaid suspension as a result. (Ex. 25, Plaintiff Depo., Doc. 22-2, at 278). This Notice listed the "subject" as a "behavior/conduct infraction". *Id.* It listed "prior notifications" as "written" on December 7, 2017, February 21, 2017, and February 14, 2018; and "final written" on February 21, 2018. *Id.* In the description the Notice stated: "Dan attended the bullying and harassment training at Pandrol in October of 2018. Dan made offensive comments, called an employee a bitch, carried on offensive conversations, and raised his voice in an altercation with another employee." *Id.* Plaintiff admitted this occurred, but asserted he "never said it to her face". (Plaintiff Depo., at 155); (Ex. 17, Plaintiff Depo., Doc. 22-2, at 183). This Notice stated at the bottom, in bold, capital letters: **"ANY CONTINUATION OF ANY OFFENSIVE, UNWANTED, OR UNWELCOMED ACTIONS WILL RESULT IN IMMEDIATE TERMINATION."** (Ex. 25, Plaintiff Depo., Doc. 22-2, at 278) (emphasis in original).

In January 2020, Defendant issued Plaintiff a Disciplinary Notice for "Plant floor confrontations." (Ex. 26, Plaintiff Depo., Doc. 22-2, at 280); (Plaintiff Depo., at 157). This notice cited as a reason: "[c]onfrontations with more than one employee on plant floor/break room." (Ex. 26, Plaintiff Depo., Doc. 22-2, at 280). As to the "[d]isciplinary action taken", it stated

4

"FINAL written warning – any further altercations after this date WILL result in immediate termination." *Id.* In the "[e]xpected change or correction section", it stated:

> NO behavior, comments or actions that are offensive, unwanted or unwelcomed to ANY OTHER PERSONS. NO behavior, comments or actions that create an intimidating or offensive environment to ANY OTHER EMPLOYEE.
>
> Dan has a choice to be aware of his comments, carry on ONLY positive conversations, comments and actions that HELP other employees rather than bring them down OR negatively affect another person's work performance.

*Id.*

Plaintiff admits he received at least five written warnings for violent, offensive, abusive, threatening, bullying, and/or intimidating conduct during the course of his employment. (Plaintiff Depo., at 131); (Ex. 17, Plaintiff Depo., Doc. 22-2, at 185).

At some point in 2021, Plaintiff attended a meeting that Tricia Ross in Human Resources conducted in which employees were told that Defendant was hiring new people at higher rates, and that Defendant intended to adjust pay rates of current employees to balance things out. (Plaintiff Depo., at 106-07). The raises were to be determined by employees' years of service, performance, skill level, and attendance, among other things. *Id.* at 108-10; *see also* Ex. 12, Plaintiff Depo., Doc. 22-2, at 41. Plaintiff testified he was told "[e]verybody across the board" would be compensated more "based on time in, attendance, and experience"; he said Ross made this promise. (Plaintiff Depo., at 104). Specifically, Plaintiff testified he heard there were going to be different classifications (one through three) of work with different compensation amounts. *Id.* at 106.

Approximately a year-and-a-half prior to his termination, Plaintiff transitioned over to the equipment side of Defendant's business. (Plaintiff Depo., at 100-01). This work was different than the work Plaintiff did previously, and Plaintiff liked it better. *Id.* at 103. As Plaintiff had moved into equipment, he was learning to operate different machines; he acknowledged this:

5

> Q: Okay, so that's one of the things for each level, not the first one, but level two and level three they're going to take into consideration. The second one is skill level, do you see that?
>
> A: Yes.
>
> Q: Okay. And performance, that's another criteria, and then attendance –
>
> A: Yes.
>
> Q: -- correct? And so you have moved into equipment and you're generating or you're getting your skill level up, you're learning how to put together this equipment, correct?
>
> A: Yes. But I'm a mechanic so it's –
>
> Q: So it's intuitive to you but you are still, these are different machines –
>
> A: Yes.

(Plaintiff Depo., at 109-10).

On August 19, 2021, Plaintiff stated to another employee that his supervisor, Ron Brogan, was a terrible person, had screwed him over for years, and that he was going to "beat" Ron Brogan's "ass". (Ex. 17, Plaintiff Depo., Doc. 22-2, at 183-85); (Plaintiff Depo., at 159).

The following day (August 20, 2021), Plaintiff met with Ross at a previously-scheduled meeting to discuss his raise. (Plaintiff Depo., at 158); (Ross Depo., at 19)[2]. Ross had no plans at the August 20 meeting to discipline Plaintiff for his actions on August 19, but intended to ask him about it:

> Q: And this – well first of all this meeting on the 20th, was this also to involve discipline as well as a discussion about a raise?
>
> A: I wanted to wait – it was . . . to discuss his increase and I was going to ask him about the outburst . . . so that I could get his side of it and then I was going to still discuss it with the site manager and Mr. Reardon . . ., but the main goal of the meeting was scheduled for was just for his increase.

---

2. Tricia Ross's deposition transcript is located at ECF Doc. 23-1.

(Ross Depo., at 20). The August 19 incident was not discussed during the meeting. (Plaintiff Depo., at 160). During the meeting, Ross tried to explain what was going to happen with a raise and the process going forward. *Id*. Ross told Plaintiff "they weren't aware of [his] experience and it hadn't been established what [his] skill level was" for purposes of the raise. *Id.* at 162-63, 165. Ross testified that Plaintiff "was going to get a raise but the amount had not been determined yet because he had recently took a position that was totally different from what he had done in the past so we didn't have enough information to determine his skill level." (Ross Depo., at 20-21). Plaintiff testified he "tried to say to [Ross] that [he'd] worked there for 26 years and [his] skill level is above everybody else's" and that he was "proficient at his job", "doing it very well" and "cranking out the parts." (Plaintiff Depo., at 162); *see also id.* at 162-63 ("I kept saying, I've got this experience in, I've got these years in, I've been in every - - and she kept saying well, but we have you in a tier two and your experience and your skill and this still hasn't been established.").

Plaintiff shouted that Pandrol was "a joke" and walked out of the meeting. (Ex. 17, Plaintiff Depo., Doc. 22-2, at 185); (Plaintiff Depo., at 161-62).[3] Plaintiff then walked back to his building and shouted that he wanted to "beat" Ron Brogan's ass, and that Brogan had screwed him over for years. (Plaintiff Depo., at 163-64, 166-67). There were "a bunch of other people around" when he said these things. *Id.* at 164, 167.

---

3. Although Plaintiff testified that he did not shout (Plaintiff Depo., at 161, 164), he previously admitted that he did. (Ex. 17, Plaintiff Depo., Doc. 22-2, at 185). "[C]onclusive admissions 'cannot be overcome at the summary judgment stage by contradictory affidavit testimony or other evidence in the record.'" *Goodson v. Brennan*, 688 F. App'x 372, 376 (6th Cir. 2017) (quoting *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 244 (5th Cir. 2014)).

That evening, after Ross spoke with site manager Jeff Waisner and Pandrol unit President Breen Reardon about Plaintiff's "two outbursts", they decided to terminate his employment. (Ross Depo., at 19-20).

Ross called Plaintiff that evening. Ross and Plaintiff recall this conversation differently. Ross testified that she "called [Plaintiff] and told him that . . . [she] had a conversation with Breen and Jeff and that . . . due to his behavior that we were going to have to part ways." (Ross Depo., at 28). Plaintiff remembers that during the call, Ross "tr[ied] to reiterate and re-explain everything that had gone down in that meeting"; Ross told Plaintiff he was not getting a raise at that time, but would possibly get one later after the company had a chance to evaluate some things. (Heilman Depo., at 167-68). Plaintiff further testified that new employees were "getting $20 an hour to start shooting and [he wasn't] making $20 yet" despite being an employee for 26 years demonstrated "there's something wrong here." *Id.* at 167. The call lasted five to ten minutes. *Id.* at 168. When asked if Ross terminated Plaintiff's employment at the end of the call, Plaintiff responded: "Pretty much, because I said I think at the end of the call, this is a fucking joke. You're just going around and around and around, you're not explaining anything to me, you're not giving me any reason whatsoever." *Id.* Plaintiff testified Ross told him they were going to have to "part ways"; although Ross did not specifically say "terminate or fire", Plaintiff understood she meant termination. *Id.* at 170. At that point, Plaintiff hung up on Ross. *Id.* Ross sent Plaintiff a termination letter the same date, stating:

> Effective, August 20, 2021, your employment with Pandrol has been terminated for the fourth offense of Personal Conduct: Comments or behavior, whether verbal or written to or about co-workers, management or others that can be interpreted or viewed as abusive or intimidating.
>
> Per our phone call on 8-20-21, your termination is effective today. If you have any questions, please contact me at the number or email below.

8

(Ex. 27, Plaintiff Depo., Doc. 22-2, at 281).

Plaintiff sought unemployment benefits following his termination. (Plaintiff Depo., at 172). He was denied initially, and again after a hearing at which both he and Ross testified. *Id.*

As to whether other individuals received raises, Plaintiff testified that:

> When people – everybody is coming back and everybody is being told, do not reveal what you've been told about what you[r] new raise is, what's everybody going to do? They're going to come out and brag about what they just got. You didn't have to ask them. So I go in and, you know, 2 o'clock in the afternoon, 1:30, 2 o'clock, whatever it was, and everybody in my division had already been in there and they're all just (indicating), they're ready to go party.

*Id.* at 169. When asked if "there were some people over 40 who also got raises, correct? It wasn't just the young people?", Plaintiff responded: "Oh, everybody on the raise got - - everybody on the property got a raise except me and one other person." *Id.* at 176. Included in those who received raises was Brent Kryling, who was 58 or 59 years old. *See id.* at 169.

Plaintiff was replaced by a 53-year-old individual. (Ross Depo., at 30).

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

9

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Defendant asserts it is entitled to summary judgment on Plaintiff's age discrimination claim because Plaintiff cannot establish a *prima facie* case as to his purported denial of a raise or his termination. Further, Defendant asserts that even if Plaintiff could establish a *prima facie* case, Defendant has presented a legitimate, nondiscriminatory reason for its actions and Plaintiff cannot show pretext. Plaintiff responds that he has created an issue of fact as to whether he was replaced by a significantly younger individual as to his termination and can show pretext as to both his denial of a raise and termination claims. For the reasons set forth below, the Court finds Defendant is entitled to summary judgment.

Both the Age Discrimination and Employment Act ("ADEA") and the Ohio Civil Rights Act prohibit firing or otherwise discriminating against employees on the basis of age. 29 U.S.C. § 623(a)(1); Ohio Rev. Code. § 4112.14 It is the plaintiff's responsibility to demonstrate "that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 (2009) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141–43, 147 (2000)).

Age discrimination claims under both the ADEA and Ohio law use the *McDonnell Douglas* burden-shifting framework. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). The employee must first establish a *prima facie* case; the burden then shifts to the employer to establish a legitimate, nondiscriminatory reason for the adverse employment action; if it does so, the burden shifts back to the employee to establish pretext. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[4]

Termination

To establish a *prima facie* case of age discrimination, a plaintiff must show: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (explaining that an inference of discriminatory intent cannot be "drawn from the replacement of one worker with another worker insignificantly younger" (internal quotation marks omitted)); *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 895 (6th Cir. 2020) ("Evidence that a company replaced a plaintiff with someone significantly younger is one way to establish a prima facie case of age discrimination under the ADEA.") (citing *Grosjean*, 349 F.3d at 335). The Sixth Circuit holds that "an age difference of six years or less between an employee and a replacement is not significant." *Grosjean*, 349 F.3d at 340.

---

4. Defendant argues that Plaintiff lacks direct evidence of age discrimination. (Doc. 22, at 16). Plaintiff does not argue he has direct evidence (*see* Doc. 23) so the Court does not reach Defendant's argument on this point.

11

*Prima Facie Case*

Defendant argues Plaintiff cannot establish a *prima facie* case of age discrimination because his replacement was 53 years old and thus not outside the protected class. (Doc. 22, at 17). That is, it contends Plaintiff cannot establish the fourth element of his *prima facie* case. Plaintiff responds that Defendant's argument is not sufficient to entitle it to summary judgment, citing *Grosjean*. (Doc. 23, at 5).

Although courts have frequently incorrectly used the "outside the protected class" language even in ADEA cases to describe the fourth prong of an age discrimination *prima facie* case, the Supreme Court has held that the ADEA does not require that the replacement be outside the protected class but instead that the replacement be "substantially younger" than the plaintiff. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."); *see also Grosjean*, 349 F.3d at 335 ("In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person."). Again, the Sixth Circuit has held that an age difference of six years or less is not substantial. *See Grosjean*, 349 F.3d at 340.

Here, Plaintiff was 59 years old when he was terminated on August 20, 2021. *See* Ex. 2, Plaintiff Depo., Doc. 22-2, at 4 (listing Plaintiff's birth date).[5] His replacement was 53. (Ross

---

5. In his opposition brief, Plaintiff asserts he was 60 years old when fired. However, as Defendant points out, he was not; a comparison of his birth date (Ex. 2, Plaintiff Depo., Doc. 22-

Depo., at 30). "[I]n the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Grosjean*, 349 F.3d at 340. Thus, this case appears to fall within *Grosjean*'s bright-line rule and Plaintiff cannot establish a *prima facie* case of age discrimination, particularly as he has not presented any other evidence suggesting age was significant, and to the contrary, he testified that virtually everyone – regardless of age – was given a raise. *See id.* ("As Grosjean was not more than six years older than Riley or Gallagher and he presents no direct evidence that First Energy considered age to be significant, his federal age discrimination claim fails.").[6]

Moreover, even if the Court were to find Plaintiff had established a *prima facie* case, it would find, as below, the Plaintiff has not presented evidence to create a genuine issue of material fact with regard to pretext.

*Legitimate Non-Discriminatory Reason*

Assuming Plaintiff could establish a *prima facie* case of age discrimination regarding his termination, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its action.

An employer's burden is one of production, not of persuasion; it need only state a reason, not prove one. *Burdine*, 450 U.S. at 254–55; *see also Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) ("This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." (citation omitted)). "When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the

---

2, at 4); (Plaintiff Depo., at 12), with his date of termination reveals he was actually 59 at the time he was fired.
6. Although Plaintiff has not argued it, the Court notes it has Plaintiff's birth date, and his replacement's age, but not his replacement's birth date. Thus, it is possible that Plaintiff's replacement was more than six years older than Plaintiff by a matter of months.

13

employee to prove that the stated reason for [his] termination is pretextual." *Blizzard*, 698 F.3d at 285.

Defendant asserts it had a legitimate, nondiscriminatory reason for terminating Plaintiff – his violation of the Personal Conduct policy. (Doc. 22, at 18-21). Violation of an employer's policies is a legitimate, non-discriminatory reason. *See Santiago v. Meyer Tool Inc.*, 2023 WL 3886405, at *4 (6th Cir.) ("We have held on many occasions that the violation of a wide variety of an employer's articulated policies constitutes a legitimate, nondiscriminatory reason for adverse employment actions") (citing *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 327 (6th Cir. 2021) (termination for insubordination in violation of policy); *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (final written warning for horseplay in violation of safety policy); *Cartwright v. Lockheed Martin Util. Servs., Inc.*, 40 F. App'x 147, 155 (6th Cir. 2002) (sleeping during break against policy)). And Plaintiff presents no argument that this is not a facially legitimate, nondiscriminatory reason. The Court finds Defendant has satisfied its burden.

*Pretext*

Defendant further asserts Plaintiff cannot show that its reason for his termination was pretextual. (Doc. 22, at 18-22). Plaintiff contends he can. (Doc. 23, at 6-8).

To show pretext, the "ultimate inquiry" is this: "did [Defendant act] for the stated reason or not?" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). To answer that question and establish pretext, plaintiffs typically establish one of three things: (1) that the employer's proffered reason "had no basis in fact," (2) that the proffered reason "did not actually motivate the employer's action," or (3) that the proffered reason was "insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400. But these are not the only ways that a plaintiff can establish pretext; these three

categories are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Tingle*, 692 F.3d at 530 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400). So plaintiffs remain free to pursue arguments outside these three categories. Even so, a plaintiff must articulate some cognizable explanation of how the evidence he has put forth establishes pretext. *Miles*, 946 F.3d at 888 Ultimately, a plaintiff must produce "sufficient evidence from which a jury could reasonably reject" Defendant's proffered reason for its actions. *Id.* (quoting *Chen*, 580 F.3d at 400). "[T]o avoid summary judgment, a plaintiff must present evidence from which a jury could reasonably find that the employer's proffered reason for the adverse employment action was not the real reason that it discharged her and that unlawful age discrimination was the true reason." *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 347 (6th Cir. 2015) (citing *Chen*, 580 F.3d at 400); *Chen*, 580 U.S. at 400 n.4 ("at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination").

Plaintiff argues he has demonstrated a question of fact regarding pretext because (1) Ross had no plans to discipline him regarding his August 19 conduct at the August 20, 2021, meeting and his prior conduct was not discussed at that meeting; (2) he was terminated for allegedly abusive comments on a single occasion; and (3) others were not terminated "after yelling that they had a gun, or were going to kill someone." (Doc. 23, at 7) (citing Plaintiff Depo., at 152).

As to Plaintiff's first reason, the Court finds it irrelevant whether Ross intended to discipline Plaintiff at the August 19 meeting because this does not negate or in any way undermine the ultimate reason for Plaintiff's termination.[7] The Court further finds Plaintiff's

---

7. Further, as Defendant points out, Ross testified she did intend to discuss the August 19 incident with Plaintiff at the August 20 meeting to "get his side of it" (Ross Depo., at 20), but she

second argument not supported by the record – although Plaintiff was terminated after his final outburst, and Ross testified that this outburst ultimately led to his termination (Ross Depo., at 19-20), Plaintiff ignores his prior disciplinary history and the termination letter which cited his actions as constituting a fourth violation of the Personal Conduct policy. (Ex. 27, Doc. 22-2, at 281). Plaintiff does not provide any evidence to contradict that this was the real reason for his termination.

Lastly, Plaintiff asserts others were not terminated for abusive behavior like "yelling that they had a gun, or were going to kill someone." (Doc. 23, at 7). Thus, Plaintiff appears to try to prove pretext by showing "the proffered reason was insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400. "The third category of pretext consists of evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which the employer contends motivated its discipline of the plaintiff." *Chattman*, 686 F.3d at 349.

But the deposition testimony to which Plaintiff refers to is as follows:

A: Yeah. But man, hey, how many times you want to write me up and tell me you're going to terminate me and do all this. I mean, obviously this stuff wasn't as serious as it sounds because it wasn't and it's – geez. * * * There were people on the floor threatening to murder other people all the time. I don't want to kill anybody. I want to kick somebody's ass.

Q: You don't want to kill them, you just want to beat their ass?

A: Damn, man, no. I mean, yeah, the people wanted to go postal, screaming at the entire shop, I've got a gun in my car and I'm going to go out and blow all your fucking heads off. Three different people did it multiple times. And I know a fourth one who threatened to stab anybody, because I got all these knives and I'm just going to come in here and kill you. Why would you make a statement like that out loud . . . What I've done pales compared to what some of these people have said and done to other people

---

never got to it. That is, contrary to Plaintiff's interpretation, Ross did not testify Plaintiff would definitively not be disciplined for his actions on August 19.

> over the years, and men wrestling and fighting on the floor and – I pushed a couple people.

(Plaintiff Depo., at 151-52). Although Plaintiff argues that "others were not terminated after yelling they had a gun or were going to kill someone" (Doc. 23, at 7), the cited testimony does not explicitly say so. Moreover, this testimony does not identify who these individuals were, whether they were disciplined or terminated, how much prior disciplinary history any of them had, or whether they were younger than Plaintiff. This is insufficient to create an issue of fact regarding pretext. *See Reams v. Int'l Union of Operating Engineers*, 2023 WL 8716978, at *5 (6th Cir.) ("Reams also cannot rely on the third option for showing pretext—that the employer's proffered reasons are insufficient to motivate the employer's action—because she does not make the required showing of a comparator.").

Therefore, the Court finds Plaintiff has not presented evidence "from which a jury could reasonably find that the employer's proffered reason for the adverse employment action was not the real reason that it discharged [him] and that unlawful age discrimination was the true reason." *Moffat*, 624 F. App'x at 347.

Denial of Raise

Defendant also argues Plaintiff cannot make out a *prima facie* case as to his claim that Defendant denied him a raise that it gave to younger employees. (Doc. 22, at 22-23). This is so, it contends, because Plaintiff was not denied a raise. Further, Defendant asserts "Plaintiff does not present any proof of discrimination as to the determination of his raise, and admits that everybody, young and old, received a raise, except for him and another person." *Id.* at 23. Plaintiff responds that he "testified that numerous other younger individuals received a raise, and that they were told not to disclose their raise amount, but they all came out of meetings bragging

17

about their new rates." (Doc. 23, at 5) (citing Plaintiff Depo., at 169). But the Court finds this does not accurately describe Plaintiff's testimony. What Plaintiff actually said was:

> When people – everybody is coming back and everybody is being told, do not reveal what you've been told about what you[r] new raise is, what's everybody going to do? They're going to come out and brag about what they just got. You didn't have to ask them. So I go in and, you know, 2 o'clock in the afternoon, 1:30, 2 o'clock, whatever it was, and everybody in my division had already been in there and they're all just (indicating), they're ready to go party.

(Plaintiff Depo., at 169). Moreover, Plaintiff himself testified that every employee – regardless of age – except for himself and one other, received a raise. *Id.* at 176. This does not demonstrate a factual question about whether Plaintiff was treated differently based on his age.

Plaintiff also cites his testimony that newly-hired employees "were receiving $20 per hour, while after 26 years with the company he was not receiving that amount of pay per hour." (Doc. 23, at 5) (citing Plaintiff Depo., at 167). But this, in and of itself, does not show Plaintiff suffered an adverse employment action. Plaintiff does not present any evidence of who these new employees were, what their ages were, or what their actual salaries were.

At its core, even viewing the evidence in the light most favorable to Plaintiff, the record does not reveal that Plaintiff was denied a raise, but rather that a final determination regarding a raise had not yet been made. Indeed, as Plaintiff's own brief puts it, "[w]hen meeting with Human Resources he was told he would possibly receive a raise later." (Doc. 23, at 6) (citing Plaintiff Depo., at 168). This is consistent with Ross's testimony that Defendant was seeking more information regarding Plaintiff's skill level before determining the raise amount. (Ross Depo., at 26). The evidence thus shows that Plaintiff was terminated prior to a final determination regarding a raise being made. The Court agrees with Defendant that Plaintiff

cannot establish a *prima facie* case of age discrimination as to his claim that Defendant denied him a raise.[8]

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 22) be, and the same hereby is, GRANTED.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

---

8. To the extent the postponement could be viewed as an adverse action, Defendant has offered a legitimate, non-discriminatory reason for that – evaluating Plaintiff's skill level in his new job. And Plaintiff has not presented evidence that this decision was pretext for age discrimination.